### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

TAMMI COAKLEY-SIMELTON,

        *Plaintiff*,

    v.

GEORGETOWN UNIVERSITY, *et al.*,

        *Defendants.*

No. 18-cv-2014 (DLF)

### MEMORANDUM OPINION

Tammi Coakley-Simelton brings this action against her employer, Georgetown University, and three of its employees, Annamarie Bianco, Laura Soerensson, and Wallace Michael Canter. *See* Compl., Dkt. 1. She alleges that the defendants retaliated and discriminated against her based on her race, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Title VII), and the District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2–1401.01 *et seq.* *Id.* Before the Court is the defendants' Motion for Summary Judgment, Dkt. 24. For the reasons that follow, the Court will grant the motion.

### I.    BACKGROUND

#### A.    Coakley-Simelton's Start at Georgetown

Coakley-Simelton began working at Georgetown on September 9, 2013.[1] Defs.' Statement of Undisputed Material Facts (Defs.' Statement of Facts) ¶ 2, Dkt. 24. As relevant here, Georgetown's job classification system uses two titles for each position: a "job title," which "broadly describes that employee's job responsibilities and requisite job qualifications," and a

---

[1] The Court cites to the defendants' Statement of Facts if a fact is undisputed. If a fact is disputed, the Court will indicate as such.

"business title," which defaults to the job title "unless the hiring official when writing the position description includes a different, more specific title." *Id*. ¶ 4. When she started working at Georgetown, Coakley-Simelton held the job title of "Program Manager 1 (Administrative)" and the business title of "Associate Director for Student Records and Accounts." *Id*. ¶ 3.

This position was located in the Office of the University Registrar (Registrar's Office), reporting to Associate University Registrar Felicidad Bunuan. *Id*. ¶ 5. Within the Registrar's Office, Coakley-Simelton provided registration and student account services to Georgetown's School of Continuing Studies. *Id*. ¶ 6. Her starting salary in 2013 was ███████ and every year since, she has received a merit-based raise. *Id*. ¶¶ 8–9. In 2016, she received an additional raise for taking on new responsibilities. *Id*. ¶ 9. Her current annual salary is ███████ *Id*. ¶ 10.

Defendant Michael Canter works as an Assistant Dean at the School of Continuing Studies. *Id*. ¶ 18. While the defendants state that he has "never been [her] manager, set her job duties, controlled her compensation or other benefits, or conducted her evaluations," *id*. ¶ 19, Coakley-Simelton asserts that he had the ability to assign her work, remove responsibilities from her, evaluate her performance, redirect her assignments, and provide input that informed her performance evaluation. Pl.'s Statement of Disputed Facts (Pl.'s Statement of Facts) ¶ 19, Dkt. 35-1. In January 2014, Bunuan asked Canter for feedback on Coakley-Simelton's performance. Defs.' Statement of Facts ¶ 20. He noted her "consistent questioning of my authority" and her "lack of timeliness when performing necessary tasks during high peak registration seasons." *Id*. ¶ 20.

## B.   Coakley-Simelton's 2014 IDEAA Complaint

On March 16, 2014, Coakley-Simelton filed a complaint with Georgetown's Office of Institutional Diversity, Equity and Affirmative Action (IDEAA) against another employee in the

School of Continuing Studies, Rachel Godlove, for allegedly discriminating against her on the basis of age and personal appearance.  *Id*. ¶¶ 13–14.  Canter was among those interviewed in connection with this complaint.  *Id*. ¶ 18.  IDEAA concluded that Coakley-Simelton failed to establish her claims of disparate treatment, harassment, and retaliation.  *See* Defs.' Mot. Ex. 7 (IDEAA Report) at 11–15, Dkt. 24-3.

### C.    Coakley-Simelton's Additional Duties

Between spring 2015 and March 2016, Coakley-Simelton was asked to assume new responsibilities for the School of Continuing Studies involving admissions, non-credit students, and academic affairs.  *Id*. ¶ 22.  In her deposition, Coakley-Simelton said that her workload had "become too much work for one person to do."  Defs.' Mot. Ex. 2 (Coakley-Simelton Dep.) at 66:12–15, Dkt. 24-3.  In late 2015, she emailed the IDEAA with a "concern" she wanted to discuss.  Defs.' Statement of Facts ¶ 25.  She met twice with an IDEAA employee, Tonya Turner.  *Id*.

The parties have differing accounts of what happened in those meetings.  According to the defendants, in the first meeting, Coakley-Simelton said that "additional duties had been 'pushed' onto her when other employees left, and that male employees had received raises when she had not," and in the second meeting, she said that "she thought there was a 'gender bias and racial component' to how work and raises were being distributed."  *Id*. ¶ 26.  According to Coakley-Simelton, in both meetings, she told Turner that "she believed she was being discriminated against on the basis of race with regards to work assignments and employer resources" and that she was "being retaliated against as a result of voicing her complaints of disparate treatment."  Pl.'s Statement of Facts ¶ 26.

On March 10, 2016, Coakley-Simelton received a salary increase, backdated to December 2015, to compensate her for these additional duties. Defs.' Statement of Facts ¶ 23. Coakley-Simelton does not dispute that she received a raise. *See* Pl.'s Statement of Facts ¶ 23. However, she does assert that Georgetown, despite her "repeated requests," denied her "additional compensation and administrative support" for this position, while her "Caucasian male colleague was approved for both a salary increase and administrative assistance." *Id*.

### D.      Reorganization of the Registrar's Office

In August 2016, Georgetown hired Annamarie Bianco as the University Registrar. Defs.' Statement of Facts ¶ 28. Bianco met with Coakley-Simelton several times during the fall of that year "about her duties and responsibilities." *Id*. ¶ 31. In one conversation, Coakley-Simelton told Bianco that she "felt she had been discriminated against by the prior administration." *Id*. ¶ 35. Bianco discussed with Coakley-Simelton the concept of the "invisible backpack," which the defendants state "was the subject of a well-known academic paper on critical race theory by Peggy McIntosh that encouraged white people to understand and combat the consequences of white privilege." *Id*. ¶ 36. Coakley-Simelton asserts that she had no familiarity with this article and interpreted these comments as "confirmation" that Bianco had "been raised to believe that whites do and should receive preferential treatment over blacks." Pl.'s Statement of Facts ¶ 36. The defendants also state that during this time period, Bianco learned that Coakley-Simelton did not have an assigned desk in the main campus location of the Registrar's Office, so she "mad[e] a desk available to her" in November 2016. Defs.' Statement of Facts ¶ 39. Coakley-Simelton asserts that she was "assigned to a storage area." Pl.'s Statement of Facts ¶ 39.

In 2017, Coakley-Simelton gave a presentation to employees in the Registrar's Office, including Bianco, about her work. *Id*. ¶ 40. During this meeting, she said she wanted a team of

employees to help her accomplish her assigned tasks.  *Id*. ¶ 41.  She said nothing during this presentation about racial discrimination.  *Id*.; *see also* Coakley-Simelton Dep. at 58:10–:19.

In July 2017, Bianco announced that Georgetown was reorganizing the Registrar's Office.  Defs.' Statement of Facts ¶ 42.  As part of this reorganization, she created a new Registration and Enrollment Services team and "made changes to areas involving veterans and academic records."  *Id*. ¶ 43.  Effective August 7, 2017, Coakley-Simelton's job title changed from Program Manager 1 to Assistant Registrar.  *Id*. ¶ 44.  The change "benefitted [Coakley-Simelton] because it placed her in a job classification category with a higher potential salary."  *Id*. ¶ 45.  Her business tile did not change.  *Id*. ¶ 46.

In November 2017, Coakley-Simelton met with Rosemary Kilkenny, the University's Vice President and head of IDEAA.  *Id*. ¶ 47.  According to Kilkenny's notes from the meeting, Coakley-Simelton "[felt] that her temporarily assigned job responsibilities need[ed] to [be] curtailed."  *Id*. ¶ 48.  The parties dispute whether Coakley-Simelton brought up issues of racial discrimination during this discussion.  *See id*.; Pl.'s Statement of Facts ¶ 48.  About a month later, she emailed Georgetown's Department of Human Resources "expressing a desire to discuss some longstanding, and continuing employment issues."  Defs.' Statement of Facts ¶ 49.  Coakley-Simelton then met with Tania Draghi, an HR representative, on December 20, 2017, and emailed Draghi thanking her "for her suggestions about things to discuss with her supervisor."  *Id*.  ¶ 50.  Coakley-Simelton asserts, and the defendants do not appear to dispute, that she discussed issues of race discrimination in this meeting.  *See* Pl.'s Statement of Facts ¶ 49; Defendants' Response to Plaintiff's Asserted Disputed Facts (Defs.' Response to Disputed Facts) ¶ 49, Dkt. 36-1.  Aside from her general conversations with Bianco in fall 2016 regarding discrimination, Coakley-Simelton never directly complained of discrimination to any of the

defendants.  *Id.* ¶ 51.  Coakley-Simelton represents that this fact is disputed and says she made

"multiple complaints" about race discrimination to Bianco, *see* Pl.'s Statement of Facts ¶ 51, but

in support, she only cites to deposition transcripts referencing the 2016 conversations with

Bianco.

In January 2018, Coakley-Simelton sent an email with the subject line "An Open-letter to

SCS" to several managers and administrators at the School of Continuing Studies—including

Canter—and copied Bianco.  Defs.' Statement of Facts ¶ 54; *see also* Defs.' Mot. Ex. 12

(Coakley-Simelton's Open Letter), Dkt. 24-3.  In the email, she wrote that "it has come to my

attention today that some program concerns have been raised regarding the many requests

programs or departments have submitted to me for processing recently but have yet to be

completed."  *Id.*  She said that she had "made several requests to management," but had been

"refused assistance each time."  *Id.*  She concluded by saying she was "hopeful that with some

pending upcoming changes" within the Registrar's Office, she could once again provide "speedy

service."  *Id.*  The letter did not mention allegations of racial discrimination.  *Id.*

Bianco emailed Coakley-Simelton that afternoon asking to meet with her about the

"many requests" she made in her letter.  Defs.' Statement of Facts ¶ 59.  Coakley-Simelton

replied that "we have spoken about so much initially, and you have been very busy with all the

wonderful changes you have made to the office so far, it is understandable you may not recall."

*Id.* ¶ 59.  Bianco then wrote to Kristen Consolo, the chief of staff of the School of Continuing

Studies, asking her to set up a meeting and saying, "I was taken off guard as the backlog

[Coakley-Simelton] is referencing was brought to her attention today and her email is the first I

am hearing of it. With that, I am concerned regarding other issues which may exist that have yet

to be escalated as well."  *Id.* ¶ 60.  In a sworn declaration, Bianco says the email "made clear" to

her that Coakley-Simelton's desire to have more staff working with her "did not match" Bianco's reorganization plan for the Registrar's Office.  Defs.' Mot. Ex. 6 (Bianco Decl.) ¶ 14, Dkt. 24-3.

In early 2018, Bianco implemented changes to the structure of the Registrar's Office. Defs.' Statement of Facts ¶ 64.  Previously, the Registrar's Office had been organized to group employees "primarily by the University school or departments they served"—for example, Coakley-Simelton provided registrar services for only the School of Continuing Studies—but Bianco changed its structure to group employees "by job function rather than school."  *Id*. ¶¶ 63– 64.  In February 2018, she assigned Coakley-Simelton to a newly-created Registration Team to handle "registration-related tasks across the University."  *Id*. ¶¶ 65, 67.  Bianco asserts that she placed Coakley-Simelton on this team because registration "had been one of her core job functions for years."  Bianco Decl. ¶ 17.  In her new role, initially Coakley-Simelton's salary, job title (Assistant Registrar), and business title (Associate Director for Student Records and Accounts) did not change.  Defs.' Statement of Facts ¶ 71.

### E.      The Written Warning

The head of Coakley-Simelton's new team, Laura Soerensson, scheduled an introductory meeting with Coakley-Simelton on February 28, 2018.  *Id*. ¶ 74.  Before the meeting, School of Continuing Studies Assistant Dean Crystal Williams told Soerensson about two registration-related requests regarding "Termination of Matriculation" lists, which Coakley-Simelton had failed to act on "for weeks."  *Id*. ¶ 75.  Soerensson raised the issue with Bianco, but because Bianco could not attend the meeting with Coakley-Simelton, she recommended that Deputy Registrar Amynah Mithani attend instead.  *Id*. ¶ 76.

In an email to Coakley-Simelton before the meeting, Soerensson said she "encourage[s]" Coakley-Simelton to bring her laptop.  Defs.' Mot. Ex. 25 (February 27–28, 2018 Email Chain),

Dkt. 24-3.  Coakley-Simelton did not bring her laptop to the meeting.  *See* Defs.' Statement of Facts ¶ 80.  Soerensson sent Coakley-Simelton an email after the meeting that said she "asked [Coakley-Simelton] clearly three times to bring your computer and each time you refused.  The purpose of bringing your computer was to review your backlogged work load."  Defs.' Mot. Ex. 27 (March 2–3, 2018 Email Chain), Dkt. 24-3.  Coakley-Simelton disputes that she was told to bring her laptop to the meeting, that Soerensson "did not clearly ask three times" that she get her laptop, and that she "did not refuse."  Coakley-Simelton Dep. at 148:3–:7.  But in an email Coakley-Simelton sent summarizing the meeting, she stated that Soerensson and Mithani "wanted me to have a laptop at this meeting."  Defs.' Mot. Ex. 28 (March 1, 2018 Email Chain), Dkt. 24-3.

At the meeting, the three discussed the overdue "Termination of Matriculation" list requests and "how the rest of the Registration Team had completed those requests while [Coakley-Simelton] was out on leave."  Defs.' Statement of Facts ¶ 78.  Soerensson directed Coakley-Simelton to determine "how many emails she failed to answer and send them to the Registration Team."  *Id*. ¶ 81.  After the meeting, Coakley-Simelton forwarded "30 to 40" outstanding emails.  *Id*. ¶ 82; *see also* Defs.' Mot. Ex. 29.  Bianco emailed Soerensson saying she thought this was "a lot" and that she "can't understand how [Coakley-Simelton] thinks this would be acceptable."  Defs.' Statement of Facts ¶ 82.

On March 22, 2018, Soerensson gave Coakley-Simelton a "Written Warning Regarding Performance," addressing her refusal to bring her laptop to the February 28 meeting and the "significant email backlog requests she had allowed to accumulate."  *Id*. ¶¶ 83–84; *see also* Defs.' Mot. Ex. 30 (Written Warning), Dkt. 24-3.  The written warning required Coakley-Simelton to provide Soerensson with a "Weekly Update" form "listing communications

to which she had failed to respond." *Id*. ¶ 85.  Soerensson read the written warning to Coakley-Simelton, but she refused to sign it. *Id*.

Coakley-Simelton then spoke to Bianco about the written warning. *Id*. ¶ 86.  Bianco told her that "this is an official means to communicate [Soerensson's] expectations as her supervisor and inform her of an action that was unacceptable," and that Soerensson had "expressed and acknowledged her recent improvements and hope[s] that this letter does not impede that improvement." *Id*.  Coakley-Simelton responded that Bianco had "answered her question" and that she "understands what has been communicated." *Id*.  Bianco wrote an email to Soerensson saying that she hoped "the team can get pas[t] this and continue to flourish." *Id*. ¶ 87.  On March 23, 2018, Coakley-Simelton provided a written "rebuttal" to Soerensson, Bianco, and Draghi, in response to the written warning in which she disputed much of the reprimand and claimed that she had been subjected to racial discrimination and retaliation.  Pl.'s Opp'n Ex. 23 (Written Warning Rebuttal), Dkt. 35-1.

### F.    Change in Position Description

In January 2018, Bianco and Soerensson began updating the position descriptions for the three members of the Registration Team, including Coakley-Simelton.  Defs.' Statement of Facts ¶ 97.  Bianco asserts that the changes in Coakley-Simelton's job description were "the most significant" because "she had transitioned from independently providing a range of services" for one school, the School of Continuing Studies, to "working at the main office with a team providing registration-focused services to all schools," whereas the other two members of the Registration Team "had previously been more focused on academic records and registration." Bianco Decl. ¶ 22.  Bianco and Soerensson changed Coakley-Simelton's business title, Associate Director for Student Records and Accounts, to match her job title, Assistant Registrar.  *Id*. ¶ 23.

9

Coakley-Simelton had held this job title since July 2017.  Defs.' Statement of Facts ¶ 99.  Bianco

asserts that they decided to change her business title to match the job title because "she was now

part of the Registration Team and working only on registration-related duties, making Assistant

Registrar a more appropriate description of her role" and because "having an Associate Director

reporting to an Associate Registrar would have been misleading and confusing."  Bianco Decl. ¶

23.  Bianco and Soerensson did not actually change Coakley-Simelton's business title until

November 13, 2018.  Defs.' Statement of Facts ¶ 101.

### G.   Senior Staff

The parties also dispute whether Coakley-Simelton was a member of the senior staff of

the Registrar's Office.  *See* Defs.' Statement of Facts ¶ 32; Pl.'s Statement of Facts ¶ 32.

Coakley-Simelton asserts that she was part of the senior staff, *see* Pl.'s Opp'n Ex. 2

(Coakley-Simelton Decl.) ¶ 5; Pl.'s Opp'n Ex. 1 (Coakley-Simelton Dep.) at 139:14–:15, Dkt.

35-1, and in support, she provides several email invitations and agendas from senior staff

meetings that occurred from 2013 to 2018, *see* Pl.'s Mot. Ex. 20, Dkt. 35-1.  She further asserts

that she was "inexplicably" removed from senior staff "without notification."  Pl.'s Statement of

Facts ¶ 32.  The defendants contend, however, that Coakley-Simelton was not actually a member

of the senior staff, but "as part of the reorganization process" Bianco invited her and the other

assistant registrars to take part in senior staff meetings.  Defs.' Statement of Facts ¶ 32.  The

defendants maintain that after the reorganization was complete, Coakley-Simelton and the other

assistant registrars were no longer invited to the senior staff meetings.  Defs.' Statement of Facts

¶ 32.

## H.     Coakley-Simelton's 2018 Performance Review

Soerensson was tasked with preparing Coakley-Simelton's annual performance review for the period from April 1, 2017 to March 31, 2018.  *Id*. ¶ 102.  Because Soerensson had only started supervising Coakley-Simelton in February 2018, she reached out to the School of Continuing Studies' Associate Deans, Canter and Michelle Mackie, for feedback on her performance.  *Id*. ¶ 103.

Canter said she was "inconsistent" in how quickly she responded to requests, and sometimes she needed "multiple reminders."  *Id*. ¶ 104.  Canter said that, although Coakley-Simelton "was always fairly professional" and "clearly cared very much about how her work was perceived," "she could be argumentative at times and had a hard time with the understanding that we are all on the same University team."  *Id*.  Further, Coakley-Simelton "would allow certain processes for certain programs but deny other programs the same access," such that "it felt as if staff members were getting preferential treatment. [S]taff were often scared to speak with her because of the push back they would receive."  *Id*.  Mackie said the time Coakley-Simelton took to respond to requests varied, as "sometimes they were done immediately" and sometimes it took "several business days or weeks," which led faculty, staff and students to "express[] frustration with perceived delays."  *Id*. ¶ 105.  Both stated they were happy with their services since the Registration Team had been created—Canter called the changes "phenomenal" and said they had led to "the best service we have ever received as a school," and Mackie said the prior timeliness issues had been "resolved now that we are working with the registration team directly."  *Id*. ¶ 106.

Soerensson presented Coakley-Simelton with her performance review on May 13, 2018. *Id*. ¶ 109.  On a five-point scale, Soerensson rated her a "3 – Meets Expectations" in some

categories and a "2 – Needs Improvement" in others, giving her an overall rating of "2 – Needs Improvement."  *Id.* ¶ 108.  Coakley-Simelton responded with a five-page rebuttal challenging every category in the review.  *See* Defs.' Mot. Ex. 35 (2018 Performance Review & Rebuttal), Dkt. 24-3.  She claimed Soerensson should not have evaluated her and said the School of Continuing Studies administrators provided feedback that was "inaccurate," "unfair," "very questionable," and a "damaging character assassination."  *Id.*

Coakley-Simelton still received a merit raise shortly after her performance review in July 2018 and in 2019.  *See* Defs.' Statement of Facts ¶ 111.  As of July 2019, ███████████████████ ████████████████████████████  Defs.' Statement of Facts ¶ 111.

## I.      Procedural History

On May 21, 2018, Coakley-Simelton filed a charge with the Equal Employment Opportunity Commission (EEOC) and the District of Columbia Office of Human Rights (DCOHR).  On May 25, 2018, the EEOC mailed her Right-to-Sue Notice, Compl. ¶ 75 and on August 27, 2018, Coakley-Simelton filed suit against Georgetown, Bianco, Soerensson, and Canter.  *See* Compl.  In her suit, she alleges (1) race discrimination and retaliation in violation of Title VII; (2) race discrimination and retaliation in violation of the DCHRA; and (3) intentional infliction of emotional distress (IIED).  *Id.* ¶¶ 76–121.  The defendants moved for summary judgment on February 3, 2020.  Coakley-Simelton has since dropped her IIED claim, *see* Pl.'s Opp'n at 41, Dkt. 35, so only the Title VII and DCHRA claims remain.  For the reasons that follow, the Court will grant the defendant's motion.

## II.     LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48

(1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*,

477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine"

if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving

party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record,

the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*,

530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with

evidence" that "a reasonable jury could credit in support of each essential element of [its]

claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is

entitled to summary judgment if the opposing party "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.  ANALYSIS

### A.  Timeliness

Under Title VII, plaintiffs "must timely exhaust their administrative remedies before

bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (alterations

and internal citation omitted). To exhaust administrative remedies, the "person aggrieved" must

file a charge with the Equal Employment Opportunity Commission within 180 days after the

alleged unlawful employment practice occurred, but this period is extended to 300 days if the

person "has initially instituted proceedings with a State or local agency." 42 U.S.C. § 2000e-

5(e)(1); *see also Ross v. Georgetown Univ.*, No. 18-cv-0671, 2019 WL 2452326, at *4 (D.D.C.

June 12, 2019).  Here, Coakley-Simelton filed a charge with both the EEOC and the DCOHR on

May 21, 2018.  Compl. ¶ 74.  This means that any alleged adverse action occurring before July

25, 2017 is time-barred under Title VII.

The DCHRA has a one-year statute of limitations.  D.C. Code § 2-1403.16(a).

Coakley-Simelton filed suit in this action on August 27, 2018.  *See* Compl.  The DCHRA's

limitations period is tolled while an administrative charge is pending before the EEOC or

DCOHR, but it begins to run again after the charge is dismissed.  D.C. Code § 2-1403.16(a); *see*

*also Ibrahim v. Unisys Corp.*, 582 F. Supp. 2d 41, 45–46 (D.D.C. 2008) (filing a charge with the

EEOC, "which in turn cross-files with the DCOHR pursuant to the worksharing agreement,

tolls" the DCHRA's statute of limitations "until the EEOC relinquishes jurisdiction over the

matter").  Coakley-Simelton filed her charge with the EEOC and DCOHR on May 21, 2018, *see*

Compl. ¶ 74, and she received her dismissal and notice of Right-to-Sue on May 25, 2018, *see id*.

¶ 75.  Taking those additional four days during which the limitations period was tolled into

account, any alleged adverse action occurring before August 23, 2017 is time-barred under the

DCHRA.

B.    **Retaliation Claims**

Title VII's anti-retaliation provision forbids employer actions that discriminate against an

employee because he or she has opposed a practice that Title VII forbids.  42 U.S.C. §

2000e-3(a).  The employer "alone" is liable for a violation of Title VII."  *Gary v. Long*, 59 F.3d

1391, 1399 (D.C. Cir. 1995); *see also Smith v. Janey*, 664 F. Supp. 2d 1, 8 (D.D.C. 2009)

("There is no individual liability under Title VII.").  Similarly, the DCHRA makes it unlawful

for "an employer" to retaliate against a person on account of that person's opposition to any

practice made unlawful by the DCHRA.  D.C. Code § 2-1402.61(a).  As relevant here, the

DCHRA defines "employer" as "any person acting in the interest of such employer, directly or indirectly."  D.C. Code § 2-1401.02(10).

Courts analyze claims arising under both Title VII and the DCHRA in the same manner. *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994).  Where, as here, a plaintiff relies on circumstantial, rather than direct, evidence of retaliation under Title VII or the DCHRA, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), applies.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII retaliation); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 235–36 n. 3 (D.C. Cir. 1999) (DCHRA retaliation).

Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  To establish a prima facie case of retaliation under Title VII and the DCHRA, she must show (1) that she engaged in statutorily protected activity; (2) that she was subjected to a materially adverse employment action; and (3) that there is sufficient evidence to infer a causal connection between the protected activity and the employment action.  *Id*.  "Adverse actions" in the retaliation context are "not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006).  But a plaintiff still must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id*. at 68 (internal citation omitted).

If the plaintiff states a prima facie case, the burden then shifts to the employer to articulate a "legitimate, non-discriminatory reason for the challenged action."  *Wiley*, 511 F.3d at 155.  Step two of the *McDonnell Douglas* framework requires employers to provide "a clear and

reasonably specific explanation as to how the employers applied their standards to the employee's particular circumstances." *Figueroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019) (internal citation omitted). If the employer articulates a non-discriminatory justification, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence." *Jones*, 557 F.3d at 677 (internal citation omitted).

### 1.   *Claims Against Bianco and Soerensson*

Coakley-Simelton claims that Bianco and Soerensson, her supervisors in the Registrar's Office, retaliated against her after she made complaints (1) to Bianco during a fall 2016 meeting, (2) to IDEAA in November 2017, (3) to HR in December 2017, and (4) to Bianco, Soerensson and Draghi in a March 2018 email "rebutting" her written warning. *See* Pl.'s Opp'n at 25–26. The parties dispute whether Coakley-Simelton mentioned racial discrimination or retaliation when she complained to IDEAA in November 2017, but the defendants concede that she did so in fall 2016, when she spoke to Bianco, *see* Defs.' Statement of Facts ¶ 35, and in December 2017, when she complained to HR, *see* Defs.' Reply to Statement of Facts ¶ 49. She also discussed discrimination and harassment in her March 2018 email "rebuttal" to her written warning, saying that she had been "treated in a harassing and discriminatory manner and that I have been specifically retaliated against as a result of previous complaints that I have voiced concerning the discriminatory and harassing nature of my working environment." Written Warning Rebuttal at 3. The parties' other disputes are immaterial because the four alleged retaliatory actions by Bianco and Soerensson occurred within several months of her December 2017 complaint. *See McIntyre v. Peters*, 460 F. Supp. 2d 125, 133 (D.D.C. 2006) ("This Court has often followed a three-month rule to establish causation on the basis of temporal proximity

alone" (collecting cases)).  Coakley-Simelton focuses on four discrete actions to support her

claim of retaliation: (1) a written warning issued in March 2018; (2) her 2018 performance

review; (3) her 2018 position change; and (4) her 2018 removal from senior staff.  *See* Pl.'s

Opp'n at 27.

i.      Written Warning

"A letter of counseling, written reprimand, or unsatisfactory performance review, if not

abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely

constitute materially adverse action under Title VII."  *Hyson v. Architect of Capitol*, 802 F. Supp.

2d 84, 102 (D.D.C. 2011); *see also Herbert v. Architect of Capitol*, 839 F. Supp. 2d 284, 302–04

(D.D.C. 2012) (letter of reprimand that faulted plaintiff for "inappropriate" and "unprofessional"

behavior is not adverse).  In *Baloch*, the D.C. Circuit held that there was no adverse action when

an employer issued an employee two letters of counseling and an official letter of reprimand,

which criticized his "failure to perform assigned duties as directed, failure to follow a

supervisor's directive and unprofessional and discourteous conduct."  *See Baloch v. Norton*, 517

F. Supp. 2d 345, 350 (D.D.C. 2007), *aff'd sub nom Baloch v. Kempthorne*, 550 F.3d 1191 (D.C.

Cir. 2008).  The court concluded that the letters were not adverse actions because they

"contained no abusive language, but rather job-related constructive criticism, which can prompt

an employee to improve her performance."  *Id*. at 1199 (internal citation omitted).

Here, the written warning contained no abusive language and was entirely job-related—it

concerned Coakley-Simelton's backlog of emails and her failure to bring her laptop to the

meeting with Soerensson.  This amounts to "constructive criticism" similar to that in *Baloch*.  It

appears that the only consequence that flowed from the written warning was the requirement that

Coakley-Simelton complete a "written weekly update" to give to Soerensson.  *See* Written

17

Warning; *Reshard v. Lahood*, No. 87-cv-2794, 2010 WL 1379806, at *16 (D.D.C. Apr. 7, 2010),

*aff'd*, 443 F. App'x 568 (D.C. Cir. 2011) (letter of warning that "implemented no punishment

against the plaintiff and merely informed her that further misconduct or refusal to perform

assignments could result in more severe disciplinary action" is not an adverse action).

Coakley-Simelton disputes the merits of the written warning, *see* Pl.'s Opp'n at 28, as she claims

that Soerensson did not require her to bring a laptop to a meeting, but merely encouraged it.[2]

That dispute does not bear on whether the written warning is materially adverse for the purposes

of her retaliation claims.  *See Saunders v. Mills*, 842 F. Supp. 2d 284, 294 (D.D.C. 2012)

(rejecting plaintiff's arguments that he disagreed with the contents of the disciplinary letter

because it "cannot be said that a reasonable employee would be dissuaded from making or

supporting a claim of discrimination based upon" its contents).  The written warning thus is not a

materially adverse action.

ii.    Performance Review

Performance reviews "typically constitute adverse actions only when attached to financial

harms," such as the employee's "position, grade level, salary or promotion opportunities."

*Baloch*, 550 F.3d at 1199.  An employer "is entitled to criticize an employee's 'negative

behaviors' without the criticism rising to the level of a materially adverse action."  *Reshard*,

2010 WL 1379806, at *20 (quoting *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009)).

While "the effect of a poor evaluation is ordinarily too speculative to be actionable," if the

---

[2] *See, e.g.*, February 27–28, 2018 Email Chain (Soerensson tells Coakley-Simelton she is "encourage[d] to bring her laptop to the meeting"); March 2–3, 2018 Email Chain (Soerensson says that at the February 28, 2018 meeting she asked Coakley-Simelton "clearly three times to bring your computer and each time you refused"); March 1, 2018 Email Chain (Coakley-Simelton writes in an email summarizing the meeting that she "did not know the laptop was still necessary").

evaluation determines the bonus, then an employee can show it caused an objectively tangible harm. *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009).

Since she was hired by Georgetown in 2013, Coakley-Simelton has received merit pay increases every year, including in 2018. Defs.' Mot. Ex. 5 (Pl.'s Salary History), Dkt. 24-3.[3] Her 2018 raise (███████) was ██████ lower than her 2017 raise (███████), *see* Pl.'s Salary History, and it was largely in line with those of the other members of the Registration Team: in 2018, ████████ another Assistant Registrar, received a raise of ████████ just ████ more than Coakley-Simelton's raise, Defs.' Mot. Exs. 5, 38; and Joe Breslin, the other Assistant Registrar, received a raise of only ████ over ████ less than Coakley-Simelton, Defs.' Mot. Ex. 39. But because Georgetown's "Staff/AAP Performance Review Process" states that "[t]he employee's individual review influences the amount of the [merit] increase," Pl.'s Opp'n Ex. 5, Dkt. 35-1, the Court will consider whether the defendants have provided non-discriminatory, legitimate reasons for Coakley-Simelton's 2018 negative performance review.

The bases for the negative 2018 performance review centered on Coakley-Simelton's time management issues and lack of responsiveness to emails. For example, the performance review stated that School of Continuing Studies "staff was not always aware of [Coakley-Simelton's] work schedule," as "work requests were sometimes handled immediately, while other requests remained pending"; that "while some registration requests were processed very

---

[3] Despite her consistent raises, Coakley-Simelton contends that her 2018 performance review caused her "objectively tangible harm" because she received a lower raise in 2018 than she otherwise would have. *See* Pl.'s Opp'n at 30. The record does not contain evidence of Coakley-Simelton's past performance reviews or whether her previous raises were correlated to those reviews, but Coakley-Simelton asserts in her declaration that her performance reviews for 2013-14, 2014-15, and 2015-16 are missing. *See* Coakley-Simelton Decl. ¶ 63. The defendants do not address her assertion, and the record contains no evidence relating to these earlier reviews.

quickly, other times [Coakley-Simelton] could be unresponsive"; that "it was difficult to know when they could speak with her about issues"; and that an area of improvement for her is "timely processing of all registrarial requests." 2018 Performance Review & Rebuttal.

This feedback is amply supported by the record, including statements made by Coakley-Simelton herself. For example, Soerensson states that before her February 28, 2018 introductory meeting with Coakley-Simelton, School of Continuing Studies administrator Crystal Williams "brought to my attention two registration-related requests made to Coakley-Simelton, regarding 'Termination of Matriculation lists,' that had been outstanding for weeks." Defs.' Mot. Ex. 22 (Soerensson Decl.) ¶ 3, Dkt. 24-3. In an email chain between Soerensson, Coakley-Simelton, and Deputy Registrar Mithani summarizing that meeting, Soerensson wrote that the two discussed "a complaint from the [School of Continuing Studies] administration which you needed to process the two Termination of Matriculation lists. One list with 16 students was sent to you on February 1st. A second list with 28 students was sent to you on February 2nd. As of February 26th when you were out of the office on unscheduled leave, both Termination of Matriculation lists were still not processed." March 2–3, 2018 Email Chain. In response to Soerensson's request for "an estimate of how many unanswered registration and records requests are pending in your email box," Coakley-Simelton wrote that, from the time period of January 26, 2018 to February 28, 2018, she had a total of 39 unread or unanswered emails that "were related to records and registration." *Id*. Soerensson then reported this to Bianco, who replied that "30–40 outstanding emails is a lot. I can't understand how she thinks this would be acceptable." *Id*.

And significantly, Coakley-Simelton *herself* acknowledged that she had issues with processing requests on time. In her 2018 "Open Letter," she wrote that "it has come to my

attention that some program concerns have been raised regarding the many requests programs or departments have submitted to me for processing recently but have yet to be completed," expressly stating that "I want to assure [the School of Continuing Studies] that I share your concern as well."  Coakley-Simelton's Open Letter.  She stated that "Your concerns are valid!  I implore you to raise any concerns you may have."  *Id*.

Additional negative feedback in Coakley-Simelton's performance review focused on her demeanor, such as her "argumentative[ness]" and her failure to "build positive relationships with all [School of Continuing Studies] stakeholders."  2018 Performance Review & Rebuttal. Evidence in the record as far back as 2014 echoes this sentiment.  In the evaluation from Coakley-Simelton's 2014 IDEAA complaint against Rachel Godlove, witnesses interviewed said she "does not take criticism well and is very defensive when an error is pointed out to her." IDEAA Report at 7.  Bianco stated in her declaration that Coakley-Simelton's "Open Letter" email from 2018 "prompted multiple people at [the School of Continuing Studies] to complain to me that Coakley-Simelton was difficult to work with."  Bianco Decl. ¶ 13.  Bianco also stated that she had personally observed "negative body language from her" and "noticeable frustration" at meetings.  *Id*. ¶ 7.

This evidence shows that Coakley-Simelton had an established history of problems with timeliness and collegiality.  Dissatisfaction with a plaintiff's work is a legitimate and nondiscriminatory reason for giving an employee a negative performance review.  *See Walden v. Patient-Centered Outcomes Research Inst.*, 304 F. Supp. 3d 123, 139 (D.D.C. 2018) (holding employer's dissatisfaction with employee's work is a legitimate reason for giving her negative performance reviews).  When it comes to an employer's reasons for taking personnel action against an employee, the issue is not "the correctness or desirability of the reasons offered," but

"whether the employer honestly believes in the reasons offered." *Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations and internal citation omitted). The defendants have provided legitimate reasons for Coakley-Simelton's performance review, and her effort to show that the defendants did not genuinely believe the negative feedback they gave her falls flat.

Coakley-Simelton criticizes the defendants for relying too "heavily" on the "fabricated feedback" provided by Canter in the performance review. *See* Pl.'s Opp'n at 30. But the record shows that Bianco and Soerensson incorporated feedback from both Canter and Mackie, who gave similar assessments of Coakley-Simelton. *See* Defs.' Mot. Exs. 36–37, Dkt. 24-3. For instance, Mackie wrote that Coakley-Simelton did "not provide[]" her with a "clear expectation as to how long the processing" of her requests would take, and that the "amount of time it took to process the requests varied." *Id*. Ex. 37. She also wrote that she "received feedback from faculty, staff and students in which they expressed frustration with perceived delays." *Id*. The comments in the performance review reflect these remarks. Coakley-Simelton presents no evidence that Canter "fabricated" his comments about her, nor does she show that the defendants unnecessarily relied on Canter's assessment. And while she appears to argue that the defendants should have solicited feedback from two other employees, she gives no details about these employees' roles or how they interacted with her.

Coakley-Simelton also offers no evidence of pretext. Citing to her "rebuttal," she primarily challenges the performance evaluation as stemming from "matters beyond her control such as delays in processing transactions even when those delays were caused by [School of Continuing Studies'] own dilatory behavior." Pl.'s Opp'n at 30. But even if Coakley-Simelton disagrees with the feedback on the merits, she provides no reason to doubt the

22

"genuineness" of the "stated justification" for her low performance ratings that would permit a jury to infer retaliation.[4]  *See Allen v. Johnson*, 795 F.3d 34, 44 (D.C. Cir. 2015).

Moreover, the record contains no specific details about which "matters" her comments concern, when they occurred, how they were beyond her control, or the ways in which employees at the School of Continuing Studies were responsible.  Coakley-Simelton's declaration also makes similar broad claims, including that Canter "allowed delayed response times in providing the [School of Continuing Studies] data necessary for me to finalize student transactions" and "refus[ed] to instruct his program staff on the correct manner in which to submit work that was intended for me."  Coakley-Simelton Decl. ¶¶ 30, 51.  But she does not provide any detail about when these alleged occurrences happened, who they involved, or specific ways in which they impacted her work.  And she cites to no exhibits or evidence in the record to elaborate on these general statements.  Her general, vague statements do not suffice to establish pretext.

While a court should not discount a plaintiff's self-serving declaration on a motion for summary judgment, *see Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016), "conclusory allegations and unsubstantiated speculation, whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, do not create

---

[4] For good reason, Coakley-Simelton does not argue that the incident involving the "invisible backpack" is evidence of pretext.  Bianco has explained that the metaphor was meant to "encourage[] white people to understand and combat the consequences of white privilege." Bianco Decl. ¶ 8.  Coakley-Simelton does not dispute that the concept of an "invisible backpack" is well-known, but she claims to have had no familiarity with it, *see* Pl.'s Statement of Facts ¶ 36, and says that she interpreted Bianco's statements as suggesting that "Caucasians should get privileged treatment over African Americans," *see* Defs.' Statement of Facts ¶¶ 35–36; Pl.'s Statement of Facts ¶¶ 35–36; Coakley-Simelton Decl. ¶ 34.  Even if Coakley-Simelton found this exchange with Bianco offensive, she has not presented any reason to doubt the genuineness of Bianco's explanation that she was trying to reassure Coakley-Simelton that she intended to work to counter white privilege in the workplace.  *See Fischbach*, 86 F.3d at 1183.

genuine issues of material fact," *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015), *aff'd*,

No. 15-cv-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015) (internal citation omitted).  On a

motion for summary judgment, the non-moving party must show more than a "mere existence of

a scintilla of evidence in support of" her position.  *Liberty Lobby*, 477 U.S. at 252.  While

"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge at summary judgment," *Barnett*

*v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal citation omitted), a

plaintiff is still "obligated to support his or her allegations by competent evidence" and cannot

avoid summary judgment through "conclusory allegations and speculation,"  *Davis v. Mnuchin*,

No. 18-cv-447, 2018 WL 8584035, at *12 (D.D.C. Nov. 13, 2018) (internal citation omitted).

Coakley-Simelton's reliance on vague, unsupported statements in a declaration to prove

that Soerensson and Bianco acted with retaliatory animus when they conducted her performance

review is not sufficient to survive a summary judgment motion.  *See Nurriddin v. Bolden*, 40 F.

Supp. 3d 104, 119 (D.D.C. 2014), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016) (plaintiff cannot "merely

speculate that his supervisors acted with retaliatory animus during the incidents of which he

complains" to defeat summary judgment).  Because the defendants have provided legitimate,

non-discriminatory reasons for the negative feedback in Coakley-Simelton's performance

review, and she has failed to establish pretext, her retaliation claim fails.

iii.     Change in Position and Title

Changes in position and title, including lateral transfers, can be considered adverse

employment actions when employees suffer "materially adverse consequences [for] the terms,

conditions, or privileges" of employment.  *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir.

2003) (internal citation omitted).  An employment action "need not entail a loss of salary, grade

level, or benefits if the plaintiff has raised a genuine issue as to whether the reassignment left

[the employee] with significantly different—and diminished—supervisory and programmatic

responsibilities." *Baloch*, 550 F.3d at 1196 (internal citation omitted).

Coakley-Simelton suffered no "diminution in pay or benefits" after her reassignment to

the Registration Team, but it is undisputed that her title and responsibilities changed.  As

Associate Director for Student Records and Accounts, Coakley-Simelton performed "multiple"

functions including "registrations and student accounts," though solely for the School of

Continuing Studies.  Defs.' Statement of Facts ¶ 63.  After she joined the newly-created

Registration Team, Coakley-Simelton handled "registration-related tasks across the University,"

*Id*. ¶ 65, but she no longer handled student accounts and billing work too.  *See* Defs.' Reply at 6.

The defendants also do not appear to contest that Coakley-Simelton's workload

decreased with her reassignment, as her previous position required her to work 65 hours a week,

but after she became Assistant Registrar, her work only took 40 hours per week.  *See* Defs.'

Statement of Facts ¶ 73.  And the Associate Director for Student Records and Accounts position

requires a Master's Degree, while the Assistant Registrar position only requires a Bachelor's

Degree.  Pl.'s Opp'n Ex. 7 (Associate Director for Student Records and Accounts Job

Description), Dkt. 35-1; *id*. Ex. 14 (Assistant Registrar Job Description), Dkt. 35-1.  Thus, her

reassignment to the Assistant Registrar position was materially adverse.

Nonetheless, Coakley-Simelton's claim of retaliation fails because the defendants have

presented "legitimate, non-discriminatory" reasons for changing her title and responsibilities.

*See Jones*, 557 F.3d at 677.  The record shows that her job change arose from a division-wide

reorganization initiated long before she assumed the new duties.  It is undisputed that when

Bianco was hired in August 2016, she "began planning a reorganization" of the Registrar's

Office.  Defs.' Statement of Facts ¶¶ 28–29; *see also* Pl.'s Statement of Facts ¶ 29.  On July 3,

2017, several months before Coakley-Simelton's job changed, Bianco sent a University-wide

memo announcing "important steps towards a reorganization" in the Registrar's Office,

including a new "Registration and Enrollment Services" team that would be a "dedicated team to

provide [schools] with consistent, manageable and standard solutions while also meeting

[schools'] unique needs and requirements."  Defs.' Mot. Ex. 19.  This memo also addressed

changes to two other areas of the Registrar's Office—"Veterans' Services" and "Scheduling and

Classroom Management."  *Id*.  And Coakley-Simelton herself appears to have been aware of

Bianco's attempts to change the organization of the office, as she testified that she had learned

about Bianco's "goals" for "new management" and that they "would do things differently."

Coakley-Simelton Dep. at 68:16–:17.

The record also shows that the defendants moved Coakley-Simelton to the Registration

Team based on factors specific to her.  *See Figueroa*, 923 F.3d at 1088.  Bianco stated that she

moved her to the Registration Team because registration was "one of [Coakley-Simelton's] core

job functions for years."  Bianco Decl. ¶ 17.  And Coakley-Simelton herself had been repeatedly

telling her supervisors that she had too much work.  *See, e.g.*, Coakley-Simelton's Open Letter

(stating that "this is more work for one person to handle without working sixty-five hours or

more in a week"); Coakley-Simelton Dep. at 57:10–58:1 (describing presentation to Registrar's

Office staff about "the increase in responsibility that has been happening"); *id*. at 66:12–66:15

(remarking that her work "has grown too much work for one person to do"); *id*. at 69:4–69:10

(agreeing that in her open letter she "pointed out that [she] had too much work to do").  While

she had requested that the Registrar's Office hire support staff for her, *see, e.g.*,

Coakley-Simelton Decl. ¶ 35, she also stated in her deposition that she asked her supervisors for

"support, assistance, student worker" or "anything" to help her with the workload.  *See*
Coakley-Simelton Dep. at 68:2–:6.  This position allowed her to supervise one or two student
employees.  *See* Assistant Registrar Job Description.  Attempting to be responsive to
Coakley-Simelton's concerns about her workload and giving her the ability to supervise
employees were legitimate, non-discriminatory reasons for reallocating some of her work.

The defendants have also offered legitimate, non-discriminatory reasons for
Coakley-Simelton's title change.  In August 2017, as part of the first phase of the reorganization,
Bianco changed Coakley-Simelton's job title from Program Manager 1 to Assistant Registrar,
*see* Defs.' Statement of Facts ¶ 44,[5] but her business title did not change, *id*. ¶ 46.  In February
2018, however, Bianco and Soerensson changed Coakley-Simelton's business title to Assistant
Registrar to match her job title, which she held for over nine months.  Bianco Decl. ¶ 23.  As the
defendants have explained, the business title defaults to the job title unless an official changes its
description.  *See* Defs.' Statement of Facts ¶ 4.  And Bianco states that she changed
Coakley-Simelton's business title for two reasons: one, to better reflect the substance of the new
position, which touched only on registration-related duties, and two, to avoid confusion that may
have arisen if an Associate Director reported to an Associate Registrar (Soerensson's title).
Bianco Decl. ¶ 23.  Each of these reasons are non-discriminatory justifications for the 2018
change in Coakley-Simelton's business title.

Faced with legitimate, non-discriminatory reasons for her reassignment and new job title,
Coakley-Simelton has not produced any evidence that would permit a reasonable jury to infer
that Bianco and Soerensson retaliated against her by changing her job responsibilities and title.

---

[5] Coakley-Simelton does not appear to argue that the 2017 change in job title alone is an adverse
action.  In fact, the defendants represent that this change placed Coakley-Simelton in a job
classification category with a higher potential salary.  Bianco Decl. ¶ 12.

She appears to argue that a single statement purportedly made by Bunuan, the former Associate
Registrar, that she "tried to save [her] job" and "[she] shouldn't complain," Coakley-Simelton
Decl. ¶ 44, is "probative" of Bianco's retaliatory intent, *see* Pl.'s Opp'n at 35.  But in a sworn
declaration, Bunuan says she never made this comment.  Defs.' Reply Ex. 3 (Bunuan Decl.) ¶ 2,
Dkt. 36-3.  And even if she had, the comment is ambiguous and does not clearly refer to any
complaints Coakley-Simelton made about discrimination.  Indeed, Bunuan states that she was
unaware that Coakley-Simelton made any complaints of discrimination.  *Id*. ¶ 3.  On this thin
record, Coakley-Simelton falls short of establishing a retaliation claim based on her change in
position and title.

iv.    Senior Staff

The parties dispute whether or not Coakley-Simelton was ever a member of the "senior
staff," *see* Defs.' Statement of Facts ¶ 32; Pl.'s Statement of Facts ¶ 32, and neither party
describes what being a member of the senior staff entails, besides attending weekly meetings, *see*
Pl.'s Opp'n Ex. 20.  But even assuming that Coakley-Simelton was a member of "senior staff"
and that supervisors removed her from this designation, she has not established that the removal
is a materially adverse action.

The anti-retaliation provision only protects employees from retaliation that "produces an
injury or harm."  *Burlington N.*, 548 U.S. at 67.  Coakley-Simelton has failed to describe *any*
injury or harm resulting from her leaving the senior staff, either in her declaration, *see* Coakley-
Simelton Decl., or her brief, *see* Pl.'s Opp'n at 32–33.  And there is no evidence that removal of
the senior staff designation caused "materially adverse consequences affecting the terms,
conditions, or privileges" of her employment or future employment opportunities.  *Stewart*, 352
F.3d at 426.  "Purely subjective injuries, such as dissatisfaction with a reassignment," are not

materially adverse, *see Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002), nor is

"snubbing by supervisors and co-workers," *Burlington N.*, 548 U.S. at 68 (citing 1 B. Lindemann

& P. Grossman, Employment Discrimination Law 669 (3d ed.1996)).  Moreover, Bianco asserts

that, along with Coakley-Simelton, other assistant registrars—including Caucasian assistant

registrars—were no longer invited to senior staff meetings after the reorganization.  Bianco Decl.

¶ 9.  Coakley-Simelton does not rebut this assertion, nor does she provide evidence that she was

somehow singled out.  Because the record contains no evidence that she suffered any "concrete

harm," the Court cannot conclude that a reasonable employee would have found a removal from

the senior staff materially adverse.

2.   *Claims Against Canter*

Coakley-Simelton claims that Canter, the Assistant Dean at the School of Continuing

Studies, retaliated against her for complaining about him to her then-supervisor Bunuan, who

worked in the Registrar's Office.  Coakley-Simelton alleges that she also complained to IDEAA

and HR on multiple occasions about Canter's "retaliatory actions."  Pl.'s Opp'n at 24–25.  And

she describes numerous actions that Canter allegedly took in retaliation: (1) scheduling meetings

for the School of Continuing Studies that conflicted with Registrar's Office meetings; (2)

"permitting his program staff to submit 'after-hours' transactions to [her] and then complaining"

when those transactions were not completed; (3) allowing "delayed response times" for

information necessary for Coakley-Simelton to complete her work; (4) permitting his program

staff to refuse to train her; (5) "blaming" Coakley-Simelton for "the transaction errors of others";

(6) failing to comply with registration protocols; (7) giving her "unjustifiable criticism"; and (8)

refusing to instruct his program staff on the correct manner in which to submit work.  *See id*.

None are materially adverse actions under the retaliation provisions of Title VII or the DCHRA.

*Meetings.*  Besides a single, general statement in her own declaration, the record contains no evidence that Canter excluded Coakley-Simelton from meetings.  Coakley-Simelton asserts that from 2016 to 2017, Canter "excluded me from internal [School of Continuing Studies] meetings" and "scheduled [School of Continuing Studies] meetings that conflicted with my previously scheduled OUR meetings."  Coakley-Simelton Decl. ¶ 30.  But she does not explain why missing these meetings caused her harm.  Nor has she identified any specific instance where she was excluded from a particular meeting, or how her alleged exclusion from unspecified meetings had any adverse impact on her.  *See Hayslett v. Perry*, 332 F. Supp. 2d 93, 105 (D.D.C. 2004).  And any incident that occurred before July 25, 2017 for Title VII claims, or August 23, 2017 for DCHRA claims, is time-barred.  *See supra* Part III.A.  With such general, unsupported statements, Coakley-Simelton has not established that her exclusion from work meetings was materially adverse.

*After-Hours Transactions*.  This alleged action suffers from similar defects.  In one sentence in her declaration, Coakley-Simelton claims that Canter permitted his "staff to submit 'after-hours' transactions to me and then complained to OUR leadership when those transactions were not completed by 9am the following morning."  Coakley-Simelton Decl. ¶ 30.  Again, she gives no details about when these alleged incidents occurred, which members of leadership he complained to, or the identities of these "staff."  Moreover, giving an employee tasks outside of work hours may be inconvenient, but it is not materially adverse.  *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 44 (D.D.C. 2001) (plaintiff who said he was "forced" to come in two hours early suffered a "mere inconvenience" and not an adverse action).  Finally, any alleged actions that occurred before July 25, 2017 or August 23, 2017 are untimely.  *See* Part III.A., *supra*.

30

*Delayed Response Times*.  Besides one statement in her declaration that Canter "allowed delayed response times in providing the [School of Continuing Studies] data necessary for me to finalize student transactions," Coakley-Simelton Decl. ¶ 30, the record contains no evidence supporting this assertion, and a plaintiff must provide more than unsubstantiated allegations to oppose a summary judgment motion, *see supra* Part III.B.1.ii.  The record also contains no indication of when these delayed responses occurred, and they, too, may be time-barred.  *See supra* Part III.A.  These "petty slights or minor annoyances that often take place at work and that all employees experience" also are not materially adverse.  *Burlington N.*, 548 U.S. at 68.

*Permitting Staff to Refuse to Train*.  In her declaration, Coakley-Simelton states that Canter "repeatedly permitted his staff to refuse to provide me with necessary training."  Coakley-Simelton Decl. ¶ 19.  The "[d]enial of training opportunities is materially adverse action only if there is a material change in employment conditions, status or benefits."  *Allen v. Napolitano*, 774 F. Supp. 2d 186, 204 (D.D.C. 2011) (alterations and internal citation omitted).  Coakley-Simelton provides no evidence of which trainings she was denied, when they occurred, how often they occurred, the topics addressed at these trainings, or how missing these trainings tangibly affected her employment.  *See Pauling v. D.C.*, 286 F. Supp. 3d 179, 203–04 (D.D.C. 2017) (no adverse employment action when the plaintiff did not provide specific details about the trainings she was denied).  She has thus not established that Canter's actions were materially adverse.  *See also DaCosta v. Birmingham Water Works & Sewer Bd.*, 256 F. App'x 283, 288 (11th Cir. 2007) (failure to train not an adverse employment action when the plaintiff did not identify any training he wanted to attend).

*Blamed for Others' Mistakes*.  Coakley-Simelton further asserts that Canter "took away" her core duty of academic scheduling and assigned it to Brett Kessler, a Caucasian employee

who was "not qualified to perform the work."  Coakley-Simelton Decl. ¶ 22.  She then states that

Kessler "made many mistakes" from 2015 to 2018, and that Canter blamed her for them.  *Id.* ¶¶

23–24.  But Coakley-Simelton does not describe one specific incidence when she was "blamed"

for an alleged "mistake," nor does the record contain any evidence of one.  Based on these vague

accusations alone, the Court cannot conclude that these incidents are actionable.  *See Mokhtar*,

83 F. Supp. 3d at 61; *see also Jones v. Billington*, 12 F.Supp.2d 1, 13 (D.D.C. 1997) ("[N]ot

everything that makes an employee unhappy is an actionable adverse action.").

*Non-Compliance With Registration Protocols.*  Coakley-Simelton again generally alleges

in her declaration that, from 2016 to 2017, Canter "redirected my transactions even though

procedural guidelines explicitly provided that such transactions be forwarded directly to me for

final processing," Coakley-Simelton Decl. ¶ 30, and that he engaged in "continued non-

compliance with registration protocols," *id.* ¶ 51.  She does not specify what these "registration

protocols" are, nor does she give evidence of any specific incident.  Even though she asserts that

Canter's behavior was "continuous," any action occurring before July 25, 2017 and August 23,

2017 is time-barred.  *See supra* Part III.A.  And Canter's actions are likely more akin to

*Burlington N.*'s "petty slights or minor annoyances" than to materially adverse actions under

Title VII and the DCHRA.

*Refusal to Instruct Staff on Submitting Work.*  In just one vague phrase in her declaration,

Coakley-Simelton asserts that Canter "refus[ed] to instruct his program staff on the correct

manner in which to submit work that was intended for me."  Coakley-Simelton Decl. ¶ 51.  The

record contains no other details about any instances in which Canter acted this way.  The Court

cannot conclude that this is materially adverse based on this general assertion alone.  *See Liberty

Lobby*, 477 U.S. at 252.

*Unjustifiable Criticism*.  Other than the criticisms she received in her performance review, Coakley-Simelton identifies no specific "unjustifiable criticism" from Canter in either her brief or her declaration.  *See* Coakley-Simelton Decl. ¶ 51 (asserting, without any detail, that she complained about Canter's "unjustifiable criticism of her performance").  And as explained above, *see supra* Part III.B.1.ii., the defendants have given non-discriminatory, legitimate reasons for the feedback in her 2018 performance review, and Coakley-Simelton has failed to establish any pretext.

### C.      Discrimination Claims

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The DCHRA makes it unlawful for an employer "to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion" or "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee" based on race.  D.C. Code § 2–1402.11(a)(1).

To state a prima facie case under either law, a plaintiff must show: (1) she is a "member of a protected class"; (2) she suffered an "adverse employment action"; and (3) the "unfavorable action gives rise to an inference of discrimination."  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal citation omitted).  As with retaliation claims, courts employ the "same three-part, burden-shifting test articulated by the Supreme Court" in *McDonnell Douglas*.  *McFarland v. George Washington Univ.*, 935 A.2d 337, 346 (D.C. 2007).  Once a plaintiff has established a prima facie case for a discrimination claim, the burden then shifts to the employer to "come

forward with a legitimate reason for the challenged action." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).  If the employer satisfies that burden, the employee must then present evidence showing that the employer's purported reason for the challenged action was in fact a pretext for unlawful discrimination.  *See id.*

For purposes of an employment discrimination claim, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131.  This Circuit has described a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Citing "generally" to only her own declaration, Coakley-Simelton again names a slew of allegedly adverse actions to support her discrimination claim: (1) "a loss in pay" as a result of the written warning and the performance review; (2) a "disproportionately heavy workload" relative to her Caucasian colleagues; (3) compensation incommensurate with her workload, as compared to her Caucasian colleagues; (4) no administrative support, unlike her Caucasian colleagues; (5) no comparable workspace to her Caucasian colleagues, (6) forcing her to train her "lesser-qualified" Caucasian colleagues and holding her accountable for their performance deficiencies, (7) unwarranted criticism regarding her performance; (8) stripping her of her "senior-level responsibilities" and (9) "demot[ing]" her.  *See* Pl.'s Opp'n at 37.[6]

---

[6] Coakley-Simelton also alleges in her complaint that the defendants denied her applications for 21 open positions at Georgetown due to racial discrimination and retaliation.  *See* Compl. ¶¶ 62–

1.      *Written Warning, Performance Review, Senior Staff, Position Change*

To the extent that Coakley-Simelton points to the written warning and her removal from senior staff, they again do not constitute adverse actions that can support a discrimination claim. *See supra* Part III.B.1.i., iv.  "Adverse actions" in the discrimination context encompass a narrower set of actions than "adverse actions" in the retaliation context.  *See Baloch*, 550 F.3d at 1198 n.4 ("[T]he requirements are distinct: Retaliation claims are not limited to discriminatory actions that affect the terms and conditions of employment and may extend to harms that are not workplace-related or employment-related so long as a reasonable employee would have found the challenged action materially adverse." (internal citation omitted)).

Assuming that both the performance review and the position change qualify as adverse actions in the discrimination context, the defendants have provided legitimate, non-discriminatory reasons for Coakley-Simelton's negative performance review and for her change in job position and title.  As noted, the concerns about Coakley-Simelton's untimeliness in processing requests and her negative demeanor were legitimate and supported by the record. *See supra* Part III.B.1.ii.  And the defendants' decision to reallocate Coakley-Simelton and adjust her job duties during the department-wide reorganization was justifiable given her extensive experience with registration matters and her long-standing complaints about her workload.  *See supra* Part III.B.1.iii.  Finally, Coakley-Simelton has not provided any evidence that these explanations were pretexts for discrimination.

---

66. The defendants address these allegations in their motion, *see* Defs.' Mot at 27–31, and Coakley-Simelton does not appear to challenge their arguments.  Accordingly, the Court treats them as conceded.  *See Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 704 F. Supp. 2d 54, 60 (D.D.C. 2010).

2.      *Other Claims*

The other actions identified by Coakley-Simelton are either wholly unsupported by the record or are not adverse actions.  She appears to make several disparate treatment claims—that she was assigned a heavier workload than her Caucasian colleagues, denied increased compensation while her Caucasian colleagues were not, denied administrative support while her Caucasian colleagues were not, and denied workspace comparable to her Caucasian colleagues.

To establish a prima facie case of disparate treatment, a plaintiff must show that she was "treated differently from similarly-situated employees outside the protected class." *Davis*, 2018 WL 8584035, at *12.  "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." *Phillips v. Holladay Prop. Servs., Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd sub nom. Phillips v. Holladay Corp.*, No. 96-cv-7202, 1997 WL 411695 (D.C. Cir. June 19, 1997) (internal citation omitted) (emphasis in original).  The Court cannot even begin to determine whether the alleged Caucasian colleagues were "similarly situated in all respects" because Coakley-Simelton resorts to vague assertions in her declaration and provides barely any description of the Caucasian individuals.

She claims that, between 2015 and 2016, she was assigned "approximately 85%" of the work of a former employee, while "one of my Caucasian colleagues, Jacob Grubbs, received a salary increase and administrative assistance for assuming the remaining 15%" of her work. Coakley-Simelton Decl. ¶ 25.  This action is time-barred because it occurred before the 2017 cutoff dates.  *See supra* Part III.A.  And aside from this broad statement in her declaration, the record contains no evidence in support of this claim, including how the duties were assigned, which specific duties Coakley-Simelton assumed, or who decided to divide up the work.

Moreover, increasing an employee's workload does not amount to an adverse action because it is "not out of the ordinary for employees to have been expected to shoulder an extra load." *See Brodetski*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001) (no adverse employment action when employer distributed the "workload unevenly by overloading him with assignments").

While Coakley-Simelton's claim that she was "refused compensation," as compared to her Caucasian colleagues, could be an adverse action, she again gives no concrete evidence about those Caucasian colleagues who purportedly received higher raises.  As noted, she states that Grubbs "received a salary increase," Coakley-Simelton Decl. ¶ 25, but she does not specify when this occurred.  And if it occurred in 2015 and 2016, when her workload allegedly increased, it too is untimely.  *See supra* Part III.A.  Aside from stating that Grubbs assumed 15% of the former employee's work, Coakley-Simelton provides *no* other details about him, let alone that he "dealt with the same supervisor, [was] subject to the same standards and [] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Toomer v. Carter*, No. 11-cv-2216, 2016 WL 9344023, at *28 (D.D.C. Mar. 24, 2016) (internal citation omitted).  Because Coakley-Simelton concedes that she eventually received a raise, s*ee* Coakley-Simelton Decl. ¶ 28, it also is unclear how any action was "accompanied by direct, negative economic consequences" that are necessary to establish an adverse action.

As to her claim that she was denied administrative support, the record does bear this out. Coakley-Simelton asserts that she asked Bianco during her April 2017 presentation for "subordinate assistance," *see* Coakley-Simelton Decl. ¶ 35, and she repeatedly stated during her deposition that she sought administrative assistance, *see, e.g.*, Coakley-Simelton Dep. at 60:15 ("you see my Caucasian counterparts claim that they have additional responsibilities and they get

support that they need, but I don't get the support that I need"); *id*. at 61:2–61:14 ("Every time I ask for help or I ask for additional support I don't get it"); *id*. at 67:5 ("I desired to have assistance and proper tools and techniques in order to accomplish the goals that were required of me"); *id*. at 67:21–68:4 ("All of the other Caucasian employees [had] a team to jump in and work together on everything," but I was "working on everything alone and reaching out and asking for support"). Bianco states that after Coakley-Simelton sent her open letter, she understood that "Coakley-Simelton's vision of the reorganization—being provided with staff who would work for her to serve [School of Continuing Studies]—did not match my developing plan." Bianco Decl. ¶ 13. But the denial of administrative support is not an adverse action. *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) ("Scarce resources and increased workloads are familiar complaints in virtually every workplace and every industry, but they do not give rise to a discrimination claim under Title VII."). It does not amount to a "tangible employment action[]" that had a significant change in Coakley-Simelton's employment status, *see Small*, 350 F.3d at 1293, and as such, it is not an adverse action.

Coakley-Simelton's complaints about her workstation are similarly not adverse actions. The parties dispute exactly what happened with respect to Coakley-Simelton's workspace— Coakley-Simelton claims that she had no desk in the Registrar's Office in 2016 and that Bianco gave her a "storage area filled with boxes" in 2017, *see* Coakley-Simelton Decl. ¶¶ 39–40, while Bianco claims that she cleared a desk for her in 2016, *see* Bianco Decl. ¶ 10. Regardless, an employee's complaints about his or her workstation do not involve a significant change in employment status required to be an adverse action under Title VII and the DCHRA. *See Brodetski*, 141 F. Supp. 2d at 45 (no adverse action when the plaintiff claimed his employer

"denied him his right to choose a new workstation" because "not everything that makes an employee unhappy will constitute actionable adverse action").

Coakley-Simelton's last claim—that she was "forced to train her lesser-qualified Caucasian colleagues and held accountable for their performance deficiencies"—is also devoid of support in the record.  Coakley-Simelton states in her declaration and deposition that Canter "insisted" that she train Kessler and later blamed her for his mistakes.  *See* Coakley-Simelton Decl. ¶ 23; Coakley-Simelton Dep. at 68:21–70:4.  But as stated above, the record contains only general statements about her encounters with Kessler.  Coakley-Simelton does not indicate when they happened, and they may well be time-barred.  *See supra* Part III.A.  Nor has she shown how her dealings with Kessler had a tangible negative impact on her employment status.  For these reasons, the Court grants summary judgment in favor of the defendants on Coakley-Simelton's discrimination claims.

### D.     Hostile Work Environment

To support a hostile work environment claim, a plaintiff must establish that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her [protected class]; and (4) the harassment affected a term, condition, or privilege of her employment."  *Richardson v. Petasis*, 160 F. Supp. 3d 88, 123 (D.D.C. 2015).  Hostile work environment claims are analyzed using the same standards under Title VII and the DCHRA.  *Id*. at 123.  The alleged harassment must be "so severe or pervasive as to alter the conditions of the [the plaintiff's] employment and create an abusive working environment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal citation omitted).  The environment must be both "objectively and subjectively offensive."  *Id*. at 787.  "To determine whether an environment is objectively abusive, courts consider the totality of the circumstances,"

including the "frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." *Richardson*, 160 F. Supp. 3d at 125 (citing *Harris v.

Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). "[S]imple teasing, offhand comments, and

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the

terms and conditions of employment." *Faragher*, 524 U.S. at 788.

  The record contains no evidence that Canter, Bianco, or Soerensson subjected

Coakley-Simelton to "severe" and "pervasive" harassment.  As to Canter, Coakley-Simelton

recites familiar allegations, again claiming that he (1) "regularly and persistently refused to train"

her on School of Continuing Studies "protocols"; (2) scheduled meetings that conflicted with her

Registrar's Office obligations; (3) withheld critical information; (4) refused to instruct his

program staff to comply with the proper procedures for submitting registration transactions; (5)

required Ms. Coakley-Simelton to fulfill other employees' responsibilities; (6) falsely accused

Ms. Coakley-Simelton of misconduct; and (7) submitted negative feedback that ultimately

affected Ms. Coakley-Simelton's performance reviews and yearly merit increases.  *See* Pl.'s

Opp'n at 39.

  Again, for all of these claims, Coakley-Simelton makes only generalized claims, without

any citations to record evidence.  To the extent that they are supported by representations in her

declaration, as discussed above, Coakley-Simelton makes vague assertions without any reference

to specific incidents.  *See, e.g.*, Coakley-Simelton Decl. ¶¶ 17–18 (Canter "began excluding me

from [School of Continuing Studies] trainings and meetings," and he "refused to provide any

help"); *id.* ¶ 30 (from 2016 to 2017 Canter "excluded me from internal [School of Continuing

Studies] meetings" and "scheduled [School of Continuing Studies] meetings that conflicted with

my previously scheduled OUR meetings"); *id*. ¶ 14 (in 2014 Coakley-Simelton told IDEAA that

Canter was "misdirecting my work" and "refusing to provide me with information needed to

complete my [School of Continuing Studies] transactions"); *id*. ¶¶ 30, 51 (from 2016 to 2017

Canter "redirected my transactions even though procedural guidelines explicitly provided that

such transactions be forwarded directly to me for final processing" and in 2018, she complained

of Canter's "continued noncompliance with registration protocols"); *id*. ¶ 25 (from 2015 to 2016,

she "was assigned approximately 85% of Ms. Young's noncredit based work"); *id*. ¶ 19 (Canter

"regularly penalized me and complained to my supervisor that I was 'taking too long' to process

transactions and that I didn't know how to do my job").

      At most, Coakley-Simelton identifies the years in which these alleged interactions

occurred, but they appear to have occurred over the course of several years, from 2014 to 2018.

*See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing a hostile work

environment claim, in part because "the alleged events [we]re temporally diffuse, spread out

over a four-year period, suggesting a lack of pervasiveness").  As detailed above, *see* Part

III.B.2., she neglects to describe any specific incidents or encounters with Canter.  Because of

this, the Court cannot discern the frequency of the conduct, nor can it determine its severity or

unreasonableness.  As such, Coakley-Simelton has failed to show how these incidents have

altered the "terms and conditions of employment."  *See Baloch*, 550 F.3d at 1201 (allegations

related to "several verbal clashes with [the plaintiff's] supervisor" are insufficient); *Rattigan*, 503

F. Supp. 2d at 81 (allegations that the plaintiff was denied "requests for additional resources

despite an increased workload" were insufficient).  Further, Coakley-Simelton has not shown

that any of Canter's alleged conduct occurred because of her race.  *See Baloch*, 550 F.3d at 1201

(plaintiff did not establish a hostile work environment claim when "none of the comments or

actions directed at [him] expressly focused on his race, religion, age, or disability"). In sum, the record contains no evidence "from which a reasonable jury could find that the hostile work environment was the result of discrimination based on a protected status." *Richardson*, 160 F. Supp. 3d at 125 (internal citation omitted).

As to Bianco and Soerensson, Coakley-Simelton bases her hostile work environment claim on allegations that the two (1) "remov[ed] [her] senior-level responsibilities"; (2) falsely accused her of misconduct; (3) required her to perform tasks outside of her job descriptions; (4) denied her access to much needed work-related systems; (5) required her to fulfill other employees' responsibilities; (6) gave her "undeserved" negative feedback on her performance review"; and (7) "demoted" her and removed her from senior staff. *See* Pl.'s Opp'n at 39.

To the extent that Coakley-Simelton bases her claim on the written warning, performance review, senior staff designation, or position change, this conduct does not rise to the level of "severe and pervasive" conduct necessary to support a hostile work environment claim. *See Baloch*, 550 F.3d at 1201. None of these incidents involve "extreme" conditions that courts have "found to constitute a hostile work environment." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018). Nor is there any evidence in the record that shows that the defendants "subjected [her] to discriminatory intimidation, ridicule, and insult" that is pervasive enough to "alter the conditions of the victim's employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (internal citation omitted). As explained, the "invisible backpack" comment was not objectively offensive. *See supra* note 5, at 23; *see also Faragher*, 524 U.S. at 788 ("isolated incidents . . . will not amount to discriminatory changes in the 'terms and conditions of employment'"). Coakley-Simelton's hostile work environment claims against Bianco, Soerensson and Canter therefore fail.

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motion for summary judgment.  A separate order consistent with this decision accompanies this memorandum opinion.


_____
DABNEY L. FRIEDRICH
United States District Judge

July 31, 2020